IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

DWIGHT WINKLEY, Father, and
Wrongful Death Beneficiary of
Isaiah Winkley, deceased, and as
a Representative of all Wrongful
Death Beneficiaries of Isaiah
Winkley, et al.                                                                PLAINTIFFS

v.                                                                 CAUSE NO. 1:23CV213-LG-RPM

HANCOCK COUNTY,
MISSISSIPPI, et al.                                                             DEFENDANTS

### MEMORANDUM OPINION AND ORDER DENYING MICHAEL CHASE BLACKWELL'S MOTION FOR QUALIFIED IMMUNITY

**BEFORE THE COURT** is the [64] Motion for Qualified Immunity filed by Defendant, Michael Chase Blackwell. This 42 U.S.C. § 1983 lawsuit arose out the officer-involved shooting of twenty-one-year-old Isaiah Winkley. After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds for the reasons state below that Blackwell's Motion for Qualified Immunity should be denied.

### I. FACTUAL BACKGROUND

On December 10, 2022, at 7:05 a.m., Brandon Wascom, a resident of Hancock County, Mississippi, called 911 and reported that a man was breaking into the home of his cousin, Jeremy Hariel. (Pl.'s Resp., Ex. 26, ECF No. 77; Def.'s Mot., Ex.A, ECF No. 64-1). He stated that the man, who would later be identified as

twenty-one-year-old Isaiah Winkley, was holding a "come-along" or "chain fall."[1] (*Id.*).

Wascom described Winkley as a white male with "dirty-blondish" hair and three eight-to-twelve-inch marks or scars on his chest and stomach area. He was wearing black pants and shoes but no shirt. (*Id.*; Pl.'s Resp., Ex. 37, ECF No. 77). It appeared that Winkley had arrived at the property on foot. (Pl.'s Resp., Ex. 26, ECF No. 77). Wascom told the operator that Winkley did not seem to be in "his right state of mind." (*Id.*). He explained, "I mean, he just one of them, he, like looks through you." (*Id.*).

The 911 operator conveyed Wascom's description of Winkley to deputies from the Hancock County Sheriff's Department. (Pl.'s Resp., Ex. 27-31, 33, 38, ECF No. 77). Deputies Laura Lynn Yeager, Chris Sholar, and Michael Chase Blackwell arrived on Hariel's property in response to the 911 call. Sholar, who was closest to Winkley throughout the incident was not wearing a body camera. Yeager and Blackwell were both wearing body cameras, and Yeager's camera provides the clearest audio and video recordation of what transpired.[2]

---

[1] A "come-along" is "a small portable winch usually consisting of a cable attached to a hand-operated ratchet." "Come-along," https://www.merriam-webster.com/dictionary/come-along (last visited Mar. 27, 2024). "A chain fall, also known as a chain hoist or chain block, is a manual lifting device used to lift and lower heavy loads. It consists of a chain or cable that is wrapped around a wheel or sprocket, which is attached to a hook." Chain Fall, https://www.aceindustries.com/chain-fall (last visited Mar. 27, 2024).

[2] The Court has had the benefit of reviewing the Yeager and Blackwell body camera video and audio footage.

When the officers approached Winkley, Sholar was carrying an assault-style rifle and a taser, Yeager was carrying a taser, and Blackwell held the leash of K9 Officer Dark in one hand and his sidearm in the other hand.  Sholar and Blackwell immediately told Winkley to show them his hands, to get his hands up, and repeatedly said, "Drop it!"  (Resp., Ex. 1 at 1:15-19, ECF No. 88-1, 91).  Yeager was the last officer to approach Winkley.  When Winkley first came into view on the video recording from her body camera, he was walking towards Blackwell and Sholar.  At that time Winkley had a 6.5-to-7-foot "T-post"[3] in his right hand.  (*Id.* at 1:20).  He was also clasping something in his left hand that was almost completely obscured.  Winkley stopped walking and twice said, "Shoot me."  (*Id.* at 1:21-23).  Initially, all three officers were separated from Winkley by an unlocked metal gate.  However, Blackwell advanced and positioned himself between the gate and a shed.  He approached Winkley with his sidearm drawn and a leashed K-9 at his side.  (*Id.* at 1:25-26).  Throughout the entire encounter with Winkley, all three officers can be heard repeatedly yelling, "Drop it!"

Sholar, separated from Winkley by a fence, walked within close range of Winkley and deployed his taser.  (*Id.* at 1:26).  Winkley turned away and fell to the ground while still holding the post and the unidentified object in his left hand.  (*Id.*

---

[3] "T-posts are steel fence posts used to support wire fencing. . . . T-posts have an anchor at the bottom that helps them stay in the ground." T-Post Size, https://fencingstaples.com/2021/06/14/what-size-t-post-to-use-for-a-4-foot-fence/ (last visited Mar. 27, 2024).  "All along the post, along the spine, there are studs or nubs that prevent the barbed wire or mesh from sliding up or down the post." Steel Fence Post, https://en.wikipedia.org/wiki/Steel_fence_post (last visited Mar. 27, 2024).

3

at 1:27-29). Blackwell advanced toward Winkley, but Winkley stood up and started to walk toward Blackwell, who then retreated. (*Id*. at 1:30-33). Winkley said, "Shoot me again," and Sholar deployed his taser a second time. (*Id*. at 1-32-33). When the taser prongs struck him, Winkley bent over with his arms crossed. The hand holding the post was at chest-level, and the other hand was at about shoulder level. He held both hands close to his body. Sholar, apparently commenting on the effects of the taser, said, "It's not working, man." (*Id*. at 1:35). At that time Blackwell replied, "I'm gonna shoot him." (*Id*. at 1:36; Pls.' Resp., Ex. 2 at 1:50). Winkley walked backwards with his arms still crossed and yelled, "Shoot me." (Pls.' Resp., Ex. 1 at 1:37-40). Yeager said, "I got you," with her taser raised. (*Id*. at 1:41). Winkley repeated, "Shoot me," and then again yelled, "Shoot me!" (*Id*. at 1:41-42). Blackwell yelled, "Drop the pole!" (*Id*. at 1:45-46). Yeager holstered her taser. (*Id*.). Winkley uncrossed his arms. (*Id*.). His left hand, which still held an obscured object, moved to his side, below his waist, and his right hand, which was holding the T-post, moved back toward his right side. (*Id*.) At that point, Blackwell fired multiple shots, striking Winkley who fell to the ground. (*Id*. at 1:46-47). They continued to tell Winkley, who was not moving, to drop the pole. Sholar rolled Winkley over and instructed Yeager to handcuff Winkley. She removed a plastic container of Mentos candy from Winkley's left hand and handcuffed him as he lay on the ground, struggling to breathe. Sholar and Yeager eventually applied pressure to Winkley's chest wounds, but he died at the scene from his injuries.

4

The Mississippi State Medical Examiner's Office performed a postmortem examination of Winkley's body and located five gunshot wounds. (Pl.'s Resp., Ex. 17 at 3, ECF No. 88-17). He was five feet, nine inches tall, and weighed 165 pounds. (*Id.* at 2). His cause of death was listed as "multiple gunshot wounds," and the determined manner of death was "homicide." (*Id.* at 1).

The Winkley family filed this lawsuit against Hancock County, Mississippi, Ricky Adam, individually and in his official capacity as Hancock County Sheriff, and Michael Chase Blackwell, individually and in his official capacity as a Hancock County Sheriff's Deputy, asserting a claim for violation of Winkley's Fourth Amendment rights pursuant to 42 U.S.C. § 1983 as well as a wrongful death claim pursuant to the Mississippi Tort Claims Act. Blackwell filed the present [64] Motion for Summary Judgment seeking qualified immunity.

## II.  DISCUSSION

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)). Once a government official raises this affirmative defense, the plaintiff has the burden of proving that the official: "(1) violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Morgan*, 659 F.3d at 371). "The second prong is satisfied only if 'the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was

5

unconstitutional.'" *Id.* (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). The second prong is generally a question of law. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024).

In order to avoid an award of qualified immunity on summary judgment, plaintiffs have the burden of demonstrating the existence of a genuine issue of material fact. *Grisham v. Valenciano*, 93 F.4th 903 (5th Cir. 2024). Even in qualified immunity cases, courts considering a motion for summary judgment usually view the facts in the light most favorable to the plaintiffs. *Id.; See also Crane v. City of Arlington, Tex.*, 50 F.4th 453, 462 (5th Cir. 2022)( All facts must be viewed in the light most favorable to the nonmovant and all justifiable inferences must be drawn in his favor.) "However, when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should view the facts in the light depicted by the videotape." *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). Nevertheless, this rule does not apply when the video evidence is ambiguous or incomplete. *Crane v. City of Arlington, Tex.*, 50 F.4th at 462. If viewing the video in the non-movant's favor "could reasonably lead to a finding of excessive force," the non-movant's account should not be disregarded, and summary judgment should be denied. *See Eggleston v. Short*, 560 F. App'x 561, 564 (5th Cir. 2014).

Excessive Force

The United States Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). This analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted). "In making this determination, a court should consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Amador v. Vasquez*, 961 F.3d 721, 727-28 (5th Cir. 2020) (cleaned up). The Fifth Circuit has provided the following additional guidance:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. However, the question is one of objective reasonableness, not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight.

7

*Id.* at 728 (internal citations and quotation marks omitted).  The "inquiry is confined to whether the officers or other persons were in danger at the moment of the threat that resulted in the officers' use of deadly force." *Amador*, 961 F.3d at 728.  "So, the focus of the inquiry should be on 'the act that led the officer to discharge his weapon.'" *Id.*

The officers were called to the scene of an alleged burglary and/or trespass and while Winkley was clearly emotionally disturbed and non-compliant, there is no contention that he was actively resisting or evading arrest.  While all factors are relevant, the "threat-of-harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021).  Here, Officer Blackwell contends that his use of deadly force was reasonable because he perceived an immediate threat of injury from Winkley.  In support of his version of events, Officer Blackwell testified that Winkley "made a quick movement to his right with that T-post, his left hand dropped down towards the waistband of his pants and the bottom of the T-post came up." (Blackwell Aff. at 3, ECF No. 14-2).  He asserts:

> As soon as the bottom of the t-post came up, he made a threat with that T-post.  When he was screaming at the tops of his lungs "SHOOT ME" it looked like he was looking straight through me, through my soul.  It was absolutely the most scariest [sic] thing I have ever seen.  In fear of my life, my area partner who had just moved up to get closer to him and my lieutenant who's right across the fence from him [sic].  I discharged my firearm four times.  I believe I was about 8 feet from the suspect when I discharged my weapon.

(*Id.* at 4).  He further explains:

8

> When I saw the suspect moving and then the T-post came up and he dropped his left hand, I didn't know whether he was reaching for a secondary weapon behind his back with his left hand or whether he was going to throw the T-post at me or swing the T-post and hit me in the head and split my skull wide open. The bottom of that T-post is very sharp – it's designed to have a shovel so it goes at the ground and holds a fence up. It's very sharp and it can split me, he could knock me unconscious and get my gun – shoot at my partners . . . just a lot of things that could have happened at that point all of which is very terrifying. We are trained in law enforcement on the 21 ft. Rule, the 21 ft. Rule is a training scenario that they do in the Police Academy and also throughout your law enforcement career. It's where basically if a subject has a weapon and he is within 21 feet of you and he actively takes off towards you, you can shoot him in the heart and he can still cause harm or kill you with whatever weapon he has in his hand.

(*Id.*) (grammatical and typographical errors in original).

On the other hand, Plaintiff's argue that Winkley did not pose an immediate threat and that the T-post was being used merely as a "walking stick" and at no time was deployed as a "weapon".[4]

After an extensive review of the video and audio portions of the body camera footage in the light most favorable to the non-moving party and, applying an objective standard to the facts therein, the Court concludes that there exist material questions of fact whether Officer Blackwell faced an immediate threat of death or bodily injury at the time he applied deadly force.

Winkley was clearly having a mental or emotional health crisis. However, he never directed verbal threats toward the officers; instead, he begged the officers to

---

[4] The Court notes that a T-post is not a "dangerous weapon" per se. Not the object's latent capability alone, but that, coupled with the manner of its use, is determinative. Thus, a T-post may become a dangerous weapon when it is wielded in a threatening manner.

shoot him. In addition, much of the testimony and many of the assertions made in support of the qualified immunity motion appear to be inconsistent with the body camera video and audio footage. A reasonable officer at the scene could have viewed Winkley's actions as nonthreatening because Winkley did not touch his waistband and he could not have grabbed an additional weapon while his hands were grasping other objects – a post in one hand and a container of mentos candy in the other.[5] The body camera video tends to supports the assertions made by Plaintiffs that a reasonable officer at the scene could have observed that Winkley was not lifting the T-post or attempting to use it in a threatening manner. In fact, contrary to Blackwell's assertions in summary judgment pleadings, none of the videos from the incident appear to show Winkley raising the T-post over his head or in any other threatening manner. At no time does it appear that Winkley was advancing toward Blackwell or anyone else just before Blackwell discharged his firearm. Therefore, the video is ambiguous as to whether Winkley posed a threat in the moments before he was shot. *See Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021) ("[T]his is not a case of no evidence to counter the officer's testimony.

---

[5] The fact that Winkley held mentos candy in his left hand cannot be considered because Blackwell's conduct "must be judged in light of the circumstances confronting him, without the benefit of hindsight." *See Amador*, 961 F.3d at 728. Nevertheless, the Court can consider Blackwell's admission that he knew Winkley was holding something in his left hand and that Winkley continued to hold the post even after he was shot, which arguably would have prevented Winkley from grabbing any alleged weapon from his waistband. (Blackwell Aff. at 3, ECF No. 14-2). The fact that Winkley was not wearing a shirt, thus making his waistband more visible, can also be considered. (*Id.*).

10

It is a case in which evidence the Supreme Court has recognized as especially compelling could be viewed as contradicting the officer's testimony.").

WHETHER BLACKWELL VIOLATED A CLEARLY ESTABLISHED RIGHT

The question of whether Blackwell violated a clearly established right of which a reasonable person would have known is a "purely legal question." *See Hatfield v. Scott*, 306 F.3d 223, 225 (5th Cir. 2002). The Supreme Court has provided the following guidance:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal citations and quotation marks omitted).

In determining what constitutes clearly established law, a court must first look to Supreme Court precedent and then to Fifth Circuit precedent. *Hicks v. LeBlanc*, 81 F.4th 497, 503-04 (5th Cir. 2023).

> When there is no direct controlling authority, [a court] may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority. Ultimately, the touchstone is fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights. In other words, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted.

*Id.*

11

"The relevant inquiry is whether existing precedent placed the conclusion that [Blackwell] acted unreasonably in these circumstances beyond debate." *See Mullenix*, 577 U.S. at 14. "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 12. Thus, the general proposition that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" is an insufficient basis for finding a violation of a clearly established right. *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Nevertheless,

> [g]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers. In fact, officials can still be on notice that their conduct violates established law even in novel factual circumstances. There can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.

*Amador*, 961 F.3d at 729-30 (internal citations and quotation marks omitted). In *Amador*, for example, the Fifth Circuit held:

> Every reasonable officer would have understood that using deadly force on a man holding a knife, but standing nearly thirty feet from the deputies, motionless, and with his hands in the air for several seconds, would violate the Fourth Amendment. . . . [A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of the force has ceased. To say otherwise would grant officers an ongoing license to kill an otherwise unthreatening suspect who was threatening earlier.

*Id.* at 730 (internal quotation marks and citations omitted).

Blackwell's argument that he did not violate clearly established law hinges on his claim that Winkley appeared to be retrieving a weapon from his waistband at

12

the time he shot him. For example, he claims that *Salazar-Limon v. City of Houston*, 826 F.3d 272 (5th Cir. 2016), is instructive here. In that case, the Fifth Circuit held:

> [C]onsidering the totality of the circumstances—which include Salazar's resistance, intoxication, his disregard for Officer Thompson's orders, the threat he and the other three men in his truck posed while unrestrained, and Salazar's actions leading up to the shooting (including suddenly reaching towards his waistband) — it seems clear that it was not unreasonable for an officer in Officer Thompson's position to perceive Salazar's actions to be an immediate threat to his safety. And, it follows that it was not "clearly excessive" or "unreasonable" for Officer Thompson to use deadly force in the manner he did to protect himself in such circumstances.

*Id.* at 279.

However, as explained previously, the video of the incident raises material questions of fact as to whether reasonable officers in Blackwell's position would have thought Winkley was reaching for a weapon. Reasonable officers, and reasonable jurors, could find that there was no furtive gesture on the part of Winkley justifying deadly force. Moreover, this contention is undercut by Blackwell's statement only seconds before firing his weapon, to wit: "I'm gonna shoot him."

Blackwell also claims that *Argueta v. Jarardi* is "on point." (Def.'s Mem. at 10, ECF No. 65). In *Argueta*, the Fifth Circuit held that a suspect's "clutching his right arm to his side as he fled at top speed was 'a furtive gesture akin to reaching for a waistband,'" such that an "officer could reasonably believe the suspect was reaching for a weapon." *See Argueta v. Jaradi*, 86 F.4th 1084, 1092 (5th Cir. 2023). Curiously, Blackwell claims the fact that Winkley's "weapon" — the T-post — was

13

in plain sight, rather than concealed, further supports a finding of qualified immunity.   This suggestion is not well-taken.  Since the Fifth Circuit has held that "an officer cannot escape liability any time he claims he saw a gun," it follows that an officer cannot escape liability merely because he saw a suspect holding a post. *See Allen*, 65 F.4th at 744.  It has also weighed heavily with the Fifth Circuit that a suspect "never reached outside the officer's line of sight" when denying qualified immunity.  *Id.* at 745.  The video reveals that both of Winkley's hands were plainly visible to Blackwell at all times, and Winkley never brandished the contents of either hand in a threatening manner.  These facts weigh against a finding of qualified immunity.  *See id.*

Blackwell's citation of *Batyukova v. Doege*, 994 F.3d 717, 722 (5th Cir. 2021), where an unarmed suspect threatened to kill officers and reached behind her back, and *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009), where the suspect reached under the seat of his car and appeared to retrieve an object that could have been a weapon, are similarly inapposite.  The videos in the record do not show Winkley reaching behind his back at any time.

Blackwell also argues that it was reasonable for him to shoot Winkley because Winkley "advanced" toward him.  The video arguably tends to show that Winkley had stopped advancing toward Blackwell at the time of the shooting.  This raises a genuine issue of material fact regarding whether Blackwell's use of deadly force was "temporally disconnected" from Winkley's approach.  *See Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015) ("We therefore find no legal error in the

14

district court's conclusion that slamming a student's head into the wall after her resistance had ceased is a violation of clearly established law.").

The Fifth Circuit has upheld a denial of qualified immunity in a case with similar facts — *Meadours v. Ermel*, 483 F.3d 417, 419 (5th Cir. 2007). In that case, Katie Raterink called 911 and reported that her brother, Robert Meadours, was having a mental episode.

> Raterink informed the officers about some of Meadours' paranoid and delusional behavior, and she requested that he be taken for treatment. She also warned the officers that Meadours was a large and strong man (he was 6 feet 2 inches and weighed 203 pounds), that he possessed a number of tools that could be used as weapons, and that Meadours feared the possibility of being involuntarily hospitalized. In her deposition Raterink stated that she informed the officers of Meadours' size only so they would not be surprised by his large frame and hurt him.

*Meadours*, 483 F.3d at 420. When officers arrived, Meadours was holding a 10.75-inch screwdriver, and his behavior became "increasingly aggressive" during his interaction with the officers. *Id.* After Meadours disobeyed the officers' orders to drop the screwdriver, one of the officers fired one beanbag round at Meadours, which struck him in the thigh. *Id.*

> In response, Meadours ran and jumped over a fence into a dog pen and climbed atop a doghouse, retaining possession of the screwdriver. Officers Dalton, Martin, and Kominek followed Meadours into the pen. The officers again ordered Meadours to drop his weapon, and he again refused. Ermel shot Meadours with a second beanbag round, but Meadours remained atop the doghouse with the screwdriver.
>
> Ermel fired a third beanbag round that the officers claim knocked Meadours off the doghouse. On this point there is significant disagreement, as the Plaintiffs claim that it was [a] bullet, not a beanbag round, that knocked Meadours from the doghouse. After

15

> falling/jumping from the doghouse, Meadours began to run toward a door leading to the garage with the screwdriver held in what the officers describe as a "stabbing grip." According to the officers, Kominek was standing near that door and they felt that Meadours was charging at Kominek with the screwdriver. Responding to the perceived threat, officers Dalton, Kominek, and Martin stated they repeatedly fired their service weapons, each a different caliber, killing Meadours. A total of twenty-three shots were fired, with fourteen striking Meadours, although the shooting only lasted a few seconds.

*Id.* at 420-21.

The *Meadours* court explained, "To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force. This balancing test requires careful attention to the facts." *Id.* at 423 (ellipsis and brackets omitted). The court identified material factual disputes that prevented an award of qualified immunity on summary judgment, including "whether Meadours was first shot while charging at Officer Kominek or while he was still atop the doghouse posing no imminent threat." *Id.* The court held, "It is for a jury to decide the factual disputes, and at this stage we cannot say the officers are entitled to qualified immunity." *Id.* at 424.

Both Meadours and Winkley were clearly suffering from mental distress at the time they were shot, and both failed to comply with orders to drop the object they were holding. Viewing the facts and the video evidence in the light most favorable to Winkley, the differences in the *Meadours* case and the present case present an even stronger basis for denying summary judgment on the basis of qualified immunity here. Specifically, Meadours, who was much larger than Winkley, was displaying more aggression, and was holding a large screwdriver with

16

a "stabbing grip." *See Meadours*, 483 F.3d at 421. While Meadours was possibly standing on a doghouse when he was shot, Winkley was standing about eight feet away from Blackwell, and the T-post Winkley held was 6.5 to 7 feet long. The video arguably tends to show that Winkley was not advancing toward Blackwell, and he was holding the middle of the T-post, with the bottom of the post at or near the ground when he was shot.

The *Meadours* decision provides a sufficient basis for finding that the right at issue was clearly established and that a genuine issue of material fact exists regarding whether Winkley posed a threat at the time he was shot. The Court further notes that the Sixth Circuit has repeatedly denied qualified immunity where there was a dispute of fact regarding whether the suspect was displaying aggression at the time deadly force was applied. *See David v. City of Bellevue*, 706 F. App'x 847, 852 (6th Cir. 2017) (denying qualified immunity when there was a dispute of fact whether suspect had his firearm raised); *King v. Taylor*, 694 F.3d 650, 653, 663-64 (6th Cir. 2012) (denying qualified immunity when officers shot a suspect who had previously threatened to kill someone but evidence and expert testimony indicated the suspect was lying on a couch with his gun "resting on his right hip" when he was shot); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011) (denying qualified immunity where a suspect's actions could have reflected compliance); *Dickerson v. McClellan*, 101 F.3d 1151, 1154, 1163 (6th Cir. 1996) (genuine issues of material fact prevented summary judgment based on qualified immunity when officers shot a suspect who had previously fired nine shots inside

17

his home and made verbal threats, but a witness testified that, at the moment of the shooting, the suspect was simply "walk[ing] slowly toward his front door . . . his arms down by his sides"); *Brandenburg v. Cureton*, 882 F.2d 211, 215-216 (6th Cir. 1989) (denying qualified immunity where there was a dispute of fact regarding whether the suspect was pointing a firearm at officers).

Similarly, the Eleventh Circuit has upheld a district court's denial of qualified immunity where the facts were "in dispute as to what happened that led [the officer] to fire his gun." *McKinney by McKinney v. DeKalb Cnty., Ga.*, 997 F.2d 1440, 1443 (11th Cir. 1993). In *McKinney*, a mother reported that her teenage son had locked himself in his bedroom with a knife. *Id.* at 1442. When officers arrived, he was sitting on the floor of his closet with a butcher knife in one hand and a twelve-inch stick in the other. *Id.* One of the officers claimed that he fired his weapon five times because the teenager threw the stick towards him and began to rise from a seated position. *Id.* The teenager claimed that he had put down the knife and was merely shifting position and not threatening the safety of anyone at the time that he was shot. *Id.* at 1443.

The video of Winkley's death is at best ambiguous as to whether Winkley is threatening or displaying aggression toward Blackwell and his fellow officers. Therefore, the video must be viewed in Winkley's favor at this stage of the litigation. *See Eggleston*, 560 F. App'x at 564. After considering numerous cases, the Court finds it is clearly established that a suspect's mere possession of an item that could be used as a weapon is not, in and of itself, justification for use of deadly

18

force. Since the video of the shooting arguably tends to support a finding that Winkley was merely holding a T-post and another item at his sides at the time he was shot, Blackwell is not entitled to summary judgment on the basis of qualified immunity.

### III. CONCLUSION

The Court recognizes that officers must make split-second decisions in extremely stressful circumstances and that those officers do not have the ability to rewind and replay a video, like the Court does, prior to acting. *See Amador*, 961 F.3d at 727-28. Nevertheless, it is well established that "the use of force should be proportional to the threat." *Allen* at 744 (citing *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016)). "Thus, if the officer could reasonably use less than deadly force, he must." *Id.* at 745.

The Court does not resolve the ultimate question of whether Blackwell violated Winkley's Fourth Amendment rights. That determination will be made by a properly instructed jury. However, viewing the evidence in the light most favorable to Winkley, there exist material questions of fact whether Officer Blackwell faced an immediate threat of death or bodily injury at the time he applied deadly force. Blackwell's request for qualified immunity must therefore be denied.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [64] Motion for Qualified Immunity filed by Defendant Michael Chase Blackwell is **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiffs shall submit a proposed order lifting the stay imposed on February 5, 2024, to the magistrate judge assigned to this case.

**SO ORDERED AND ADJUDGED** this the 21st day of April, 2024.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE